**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**THOMAS CHIC,**

**Plaintiff,**

**v.** **Case No. 25-CV-991**

**WATERFORD UNION HIGH SCHOOL DISTRICT,**

**Defendant.**

---

## DECISION AND ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

---

Thomas Chic sues his former employer, Waterford Union High School District ("the District"), alleging discrimination and failure to accommodate in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. Both Chic and the District move for summary judgment in their favor as to both of Chic's claims. (Docket # 23; Docket # 29.) The District additionally seeks partial summary judgment on several of Chic's requested damages. (Docket # 24 at 33–36.) Because disputes of material fact exist as to Chic's claims, both parties' motions for summary judgment as to Chic's ADA claims are denied. However, the District's motion for partial summary judgment as to certain of Chic's requested damages is granted.

## BACKGROUND

Chic began working for the District as a part-time cleaner in August 2004. (Def's Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 25 and Pl.'s Response to DPFOF ("Pl.'s Resp.") ¶ 1, Docket # 44-1.) Chic became a full-time custodian at the District on

December 21, 2007. (*Id.* ¶ 2.) As a full-time custodian, Chic worked third-shift during the school year, which was from 10:30 p.m. until 7:00 a.m., and first- or second-shift during the summer. (*Id.* ¶ 3.)

Joshua Wensing has been the District's Director of Buildings and Grounds since July 2021. (Declaration of Joshua Wensing ("Wensing Decl.") ¶ 2, Docket # 26.) Wensing avers that he oversees all facets of the buildings and grounds for the District, and when he started at the District, there were six full-time custodians who reported to him. (*Id.* ¶¶ 2–3.) On August 22, 2022, the District hired Kimberly Milas as an Operations Supervisor, at which point the District's custodians reported to Milas, who reported to Wensing. (*Id.* ¶ 6.) Wensing continued, however, to oversee the custodial team. (*Id.*)

The District's 288,000 square foot, two-story building, has four distinct elevations, and access to certain areas requires the use of stairs, a lift, or an elevator. (DPFOF ¶ 4 and Pl.'s Resp. ¶ 4.) The District divided up the areas of its building and assigned each custodian specific areas for cleaning. (*Id.* ¶ 5.) The District's long-standing procedure during the school years was that each custodian was responsible for cleaning his or her assigned area in its entirety. (*Id.* ¶ 6.)

Prior to 2022, Chic was responsible for cleaning an area on the first floor of the District's building, which involved at least one flight of stairs. (*Id.* ¶ 7.) From some point in 2022, until his termination in August 2023, Chic was assigned responsibility for an area on the second floor of the District's building. (*Id.* ¶ 8.) Chic's assigned second-floor area included a fitness center, a fitness multipurpose room, classrooms, storage facilities, a teacher's lounge, and culinary kitchens for cooking classes. (*Id.* ¶ 9.) Custodians would also

be assigned to clean or assist in preparing other areas due to an emergency or problem, or a special event in another area of the District's building. (*Id.* ¶ 10.)

During the summer months, the District asserts that every custodian would work on the entire District building, while Chic contends that each custodian was given a specific duty area, which often changed from day to day. (*Id.* ¶ 11.) The parties agree, however, that if a custodian was absent, Chic or other custodians would be asked to cover additional areas in the building. (*Id.* ¶ 12.) A custodian's job description included such duties as emptying waste baskets; mopping floors; cleaning spillages with a wet mop; moving furniture and setting up meeting areas; shoveling snow and other winter-related work; helping with grounds keeping and other summer duties; preparing, sealing, and buffing floors in preparation for floor finishing; operating a floor scrubbing machine and wet vacuum; and dusting surfaces that require the use of a ladder, scaffolding, or aerial platforms. (Declaration of Ashley McNulty ("McNulty Decl.") ¶ 2, Ex. A, Deposition of Thomas Chic ("Chic Dep.") at 24–25, Docket # 28-1; McNulty Decl. ¶ 7, Chic Dep. Ex. 2, Docket # 28-13.)

In 2011, Chic underwent a laminectomy surgery on his lower lumbar spine due to overuse of his back, which caused arthritis and narrowing of his spinal canal. (DPFOF ¶ 24 and Pl.'s Resp. ¶ 24.) During the procedure, Chic's spinal nerve was nicked, causing him to develop foot drop. (*Id.* ¶ 25.) Chic testified that his foot drop condition causes him to "have to walk a little bit different," stating that his "foot drops to the left side . . . so [he has] to pick it up higher." (Chic Dep. 61–62.) He further testified that sometimes while walking his foot "will catch" and it will "drag a little bit," so he must "really concentrate on picking it up off the ground." (*Id.* at 62.) Chic states that he used to hike but can no longer do it

because of his difficulty walking on uneven ground. (*Id.*) From August 2011, when Chic recovered from surgery, until July 2021, Chic did not have or seek restrictions from work related to his foot drop. (DPFOF ¶ 31 and Pl.'s Resp. ¶ 31.)

Floor stripping at the District was performed primarily during the summer months. (Pl.'s Proposed Findings of Additional Facts ("PPFAF") ¶ 14, Docket # 44 and Def.'s Resp. to PPFAF ("Def.'s Resp.") ¶ 14, Docket # 50.) The floor stripping process involves mixing a solution called "RipSaw" with hot water in a bucket, laying down the solution with a mop, and then scrubbing the floor to take layers of wax off the floor. (DPFOF ¶ 39 and Pl.'s Resp. ¶ 39.) The custodians would either use a manual scrubber or a walk-behind machine to remove the wax. (*Id.* ¶ 40.) After the floor dried, the custodians would apply fresh wax to it and then finish by rinsing the floor. (*Id.* ¶ 41.) Until Wensing became Chic's supervisor in 2021, Chic infrequently stripped the floors. (*Id.* ¶ 36.) The few times that Chic had stripped the floors before Wensing became his supervisor, Chic said that he was physically capable of doing so. (*Id.* ¶ 37.) Chic was not asked by Wensing to strip floors for two years but would sometimes help others by changing buckets of solution. (*Id.* ¶ 38.)

On July 9, 2021, while training college students who worked at the District during the summer, Chic fell twice while stripping the floor. (*Id.* ¶ 42.) When Chic fell, the stripping solution was on the floor, and he was using the District's walk-behind stripping machine. (*Id.* ¶ 43.) After Chic fell the second time on July 9, he went to the Aurora Occupational Health Services Clinic. (*Id.* ¶ 44.) There, treating provider Leroy Spurlock, PA-C, prepared a Worker's Compensation Return to Work Report. While Spurlock included restrictions in Chic's July 9, 2021, Return to Work Report, he did not restrict Chic from floor stripping. (*Id.* ¶ 45.)

Chic returned to the clinic on July 15, 2021, and the treating physician, Dr. Scott Dresden, prepared another Worker's Compensation Return to Work Report for Chic. (*Id.* ¶ 46.) In the July 15 report, Dr. Dresden wrote that Chic "may return to work without restrictions" effective July 15. (*Id.* ¶ 47.) Dr. Dresden wrote that Chic's anticipated maximum medical improvement was "one week," meaning Chic was probably one week away from being recovered from the July 9 floor stripping accident. (*Id.* ¶ 48.) Under the "instructions" section of the report, Dr. Dresden wrote that Chic should "avoid stripping floors (due to pre-existing issue) in order to avoid further injury." (*Id.* ¶ 49.) The report did not, however, identify Chic's "pre-existing issue" or state how long he should avoid stripping floors. (*Id.* ¶ 50.) Chic states that he gave Wensing the July 15, 2021, report and that Wensing looked at the report and said "okay," but they did not discuss the floor-stripping restriction. (*Id.* ¶¶ 52–53.) Wensing, however, testified that he did not see the document until July of 2023—two years later. (McNulty Decl. ¶ 3, Ex. B, Deposition of Joshua Wensing ("Wensing Dep.") at 38–39, Docket # 28-2.)

On July 6, 2023, Milas, Chic's new supervisor, asked Chic to strip floors. (DPFOF ¶ 55 and Pl.'s Resp. ¶ 55.) Chic informed Milas that he should not strip floors. (*Id.* ¶ 57.) Because Milas stated she was unaware of the restriction and could not find the July 15, 2021, Return to Work Report in Chic's file, Chic found a copy of it at his home and brought it to work. (*Id.*) Until providing the July 15, 2021, report, Chic continued to strip the floor using a swing arm machine and standing on areas of the floor that did not have the stripping solution on them. (*Id.* ¶ 58.) Chic stated that he gave this report to the District's Superintendent, Dr. Lucas Francois, in July 2023, and Francois said he would review it. (*Id.* ¶¶ 59–60.)

As the report referenced Chic's falls two years prior, the District requested Chic provide updated information. (*Id.* ¶ 61.) In a letter dated July 21, 2023, Wensing informed Chic that the District "fel[t] it would be best to have an evaluation completed for all custodial duties listed on page 21 and 22 of the 2005-2008 custodial contract which was presented to [Chic] in 2007 when [he was] hired as a full time custodian." (Declaration of Thomas Chic ("Chic Decl.") ¶ 4, Ex. B, Docket # 45-2.) Wensing provided Chic with a copy of the 2005-2008 custodial contract, along with a Fitness for Duty form to be completed by his physician. (*Id.*)

Chic visited his primary care physician, Dr. Sandra Scalzitti, on July 24, 2023. (DPFOF ¶¶ 65, 70 and Pl.'s Resp. ¶¶ 65, 70.) Chic first treated with Dr. Scalzitti on August 2, 2022; however, there is no reference in the records from that visit of Chic having any neurological issues, foot drop, or back problems. (*Id.* ¶¶ 66, 68.) After the July 24, 2023, visit, however, Dr. Scalzitti added the diagnoses of chronic left-sided low back pain with left-sided sciatica, left foot drop, and primary hypertension to his record. (*Id.* ¶ 74.) The July 24, 2023, visit notes indicated that Chic brought in copies of his "previous paperwork and his new form," referring to the District's Fitness for Duty form and his Aurora Occupational Health records from July 2021. (*Id.* ¶ 75.) During this visit, Dr. Scalzitti did not perform any physical tests or assess Chic's ability to function; rather, she relied on Chic's records from his Aurora visit in July 2021. (*Id.* ¶¶ 78–79.)

In his Fitness for Duty form, Dr. Scalzitti wrote that Chic's medical condition, which she understood to be foot drop, commenced in 2011 and would last a lifetime. (*Id.* ¶ 81.) She noted that his medical condition limited one or more of his major life activities, specifically difficulty walking on slippery or uneven surfaces. (*Id.* ¶ 82.) On the section of the form

addressing job functions that Chic was "unable to perform," Dr. Scalzitti wrote: "no stripping floors due to foot drop; avoid slippery or uneven surfaces, caution on snow/ice or with ladders." (*Id.* ¶ 84.) Dr. Scalzitti wrote that effective July 24, 2023, Chic could return to work with the restriction of "no stripping floors or walking on slippery or uneven surfaces." (*Id.* ¶ 85.) Chic provided Francois with his completed form on his next workday. (*Id.* ¶ 89.)

On August 2, 2023, Francois held a meeting with Chic, along with the District's principal, Dan Foster, and Joe Vogt, a staff member who acted as Chic's representative. (*Id.* ¶ 111.) During the meeting, Francois told Chic that the District was unable to accommodate him without undue hardship, and thus it was terminating his employment. (*Id.* ¶ 113.) After applying Chic's sick and vacation days, his last date of employment with the District was November 2, 2023; however, his last date of work was August 2, 2023. (*Id.* ¶¶ 114–15.) In Fall 2023, Chic started working as a full-time, second-shift custodian with the Franklin Public Schools. (*Id.* ¶ 125.)

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

In this case, both Chic and the District move for summary judgment in their favor on Chic's claims. When both parties move for summary judgment in their favor on the same issue, "the court must consider the evidence through two different lenses." *Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 877, 890 (S.D. Ind. 2009). Specifically, "[w]hen considering defendants' motion[ ], the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences. When considering plaintiffs' motion[ ], defendants receive those benefits." *Id.*

## ANALYSIS

The ADA prohibits discrimination "against a qualified individual on the basis of disability," including by failing to make "reasonable accommodations." *Jezior v. City of Chicago*, 179 F.4th 569, 574 (7th Cir. 2026) (citing 42 U.S.C. § 12112(a), (b)(5)(A)). Chic alleges the District discriminated against him by failing to accommodate his disability and by terminating his employment based on his disability. I will address each claim in turn.

*1. Failure to Accommodate*

1.1 Legal Standard

To establish a *prima facie* failure to accommodate claim under the ADA, an employee must show that: (1) he was a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate his disability. *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016).

The ADA requires that both the employer and the employee engage in an "interactive process" to find a reasonable accommodation for the employee's disability. *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016). Both parties must make a "good faith effort" to determine what accommodations are necessary; however, "if a breakdown of the process occurs, 'courts should attempt to isolate the cause . . . and then assign responsibility.'" *Id.* (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). Failure of the interactive process is not, however, an independent basis for liability under the ADA. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292 (7th Cir. 2015). "Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the

question of whether she was able to perform the essential functions of her job with an accommodation." *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013).

If a plaintiff establishes these elements of the *prima facie* case, and shows that the requested accommodation is reasonable on its face, the burden shifts to the employer to prove that the requested accommodation would impose an undue hardship. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 798 F. Supp. 3d 879, 901 (C.D. Ill. 2025).

For purposes of summary judgment, the District does not argue that it was unaware of Chic's disability. (*See* Docket # 24; Docket # 40; Docket # 48.) Thus, the question is whether a genuine dispute of material fact exists as to whether Chic is a "qualified individual" under the ADA and whether the District failed to reasonably accommodate his disability.

### 1.2 Whether Chic is a "Qualified Individual" Under the ADA

The statute defines a "qualified individual" as someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

#### 1.2.1 Essential Functions of the Job

First, I must identify the essential functions of the job. *Stern*, 788 F.3d at 285. The Seventh Circuit has stated that the "statutory text of the ADA provides little guidance on how to determine whether a particular job function is essential or not, but regulations implementing the ADA identify seven non-exclusive categories of evidence to consider." *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022) (citing 29 C.F.R. § 1630.2(n)(3)). These categories include:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The Seventh Circuit further found that while an employer's judgment is an "important" factor, it is "not necessarily decisive," and while the court's "cases have often noted that some degree of deference is appropriate," careful attention to the regulation's other evidentiary factors "can counter the employer's judgment." *Tate*, 51 F.4th at 794–95. Additionally, whether a function is "essential" is a question of fact. *Id.* at 794.

Both parties point to the duties listed on pages 21 and 22 of the 2005-2008 Custodial Contract as a starting point for consideration of the essential functions of the custodian job. Chic argues that several of the listed duties are not "essential functions" of the position, specifically, "shoveling snow and other winter-related work"; outside grounds keeping; and preparing, sealing, and buffing the floor. (Docket # 43 at 16–17.) While Chic argues that assisting in outdoor grounds keeping is not an essential function, I need not decide whether this function is essential because Chic's asserted restrictions do not encompass this task.

As to the other contested functions, a reasonable jury could find that snow and ice removal, as well as preparing, sealing, and buffing the floor, are essential functions of the custodian job. Regarding snow and ice removal, Chic argues that "shoveling snow and

other winter-related work" is not an essential function because Wensing never asked Chic to go outside and shovel snow or ice. (Docket # 43 at 16–17.) Wensing's failure to ask, however, does not, in and of itself, establish that the task was non-essential. Shoveling snow and performing "other winter-related work" is listed as one of a custodian's duties in the written job description. (Docket # 28-13 at 4.) Chic testified that, as a full-time custodian at the District, he helped with snow and ice removal. (Chic Dep. at 35–36.) Even after a full-time "outside person" was hired, Chic would still assist in snow removal at times of heavy snowfalls or when help was needed. (*Id.* at 35, 171.) Chic testified that he voluntarily went outside to assist with these tasks during the winters of 2021-2022 and 2022-2023 on six or seven occasions. (*Id.* at 171.) Chic worked at a building in Wisconsin. It is unsurprising that the task of snow removal is included in the custodian's written job description. And given the frequency with which Chic actually assisted in the process of snow removal, sufficient evidence exists for a reasonable jury to find these tasks "essential."

Chic further argues that preparing, sealing, and buffing the floor in preparation for sealing was performed only during the summer months and thus was not an essential function of the job. (Docket # 43 at 17.) As an initial matter, while "preparing, sealing, and buffing the floor in preparation for floor finishing" is a task included in the custodian's written job description, the term "floor stripping" is not. It is not entirely clear whether "floor stripping" falls under the category of "preparing, sealing, and buffing the floor." What the evidence does indicate, however, is that "buffing" and "stripping" are tasks done primarily during the summer months (Chic Decl. ¶¶ 26, 49), and they take longer and involve more steps than simple mopping or scrubbing the floor (Chic Dep. at 40–45). Floor stripping also appears to be a more skilled task, requiring training to perform. (*Id.* at 64.)

Thus, while these tasks were performed less frequently, this is not dispositive of whether the tasks were essential or marginal. A jury could reasonably determine that these tasks were limited to the summer months, not because they are unessential, but because they are more time-consuming and need to be done when students are generally not in the building. For these reasons, a genuine dispute of fact exists as to whether these tasks are essential to the custodian position.

#### 1.2.2 Whether Chic Can Perform the Job's Essential Functions With or Without Reasonable Accommodation

Next, I must consider whether there is a genuine issue of material fact as to whether Chic could perform the essential functions of the job with or without reasonable accommodation. Under the ADA, a "reasonable accommodation" may include such things as: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

At the heart of the parties' dispute is the meaning of Dr. Scalzitti's restrictions on the July 2023 Fitness for Duty form. The parties do not dispute that, despite suffering from foot drop since 2011, Chic was able to perform all of his custodial duties without accident until his July 9, 2021, falls. (PPFAF ¶ 4 and Def.'s Resp. ¶ 4.) The parties further agree that subsequent to Chic's falls while floor stripping in July 2021, Chic had no further accidents and was performing all of his job duties with the exception of stripping floors. (*Id.* ¶ 6.) Chic testified that subsequent to his 2021 falls, he was still able to perform "regular floor scrubbing" and safely walk on that surface while wet. (Chic Dep. at 80.) Chic avers that

during his termination meeting (which he obtained consent to record), he told Francois that he had performed his job for twelve years and asked him, "what the difference is now," to which Francois responded that now he has a physician "that says that you must have these accommodations, and I can't knowingly put you into those positions where you may have a need to climb a ladder, you may have a need to work with water, you may have a need to remove snow or ice." (Chic Decl. ¶¶ 46, 51–54.)

Again, Dr. Scalzitti wrote that Chic should not strip floors, should avoid slippery or uneven surfaces, and should use caution on snow, ice, and with ladders. (Docket # 28-26 at 3.) The District argues that Dr. Scalzitti's restrictions were "clear and unambiguous" and the District was entitled to rely on these restrictions when considering Chic's job duties and making decisions regarding his employment. (Docket # 48 at 7.) Chic argues that the District unreasonably converted exercising "caution" on snow, ice, and with ladders into an "absolute ban" and avoiding slippery surfaces to "a prohibition on working with water." (Docket # 43 at 2.) Chic contends that the District never sought clarification from Dr. Scalzitti or from Chic himself regarding the scope of the restrictions, while the District argues that no clarification was necessary because the restrictions were clear.

The District argues, citing *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 968 (7th Cir. 2020), in support, that once an employee is evaluated by a doctor, the employer is entitled to rely on that physician's recommendation that the employee is unable to safely perform an essential job function. (Docket # 48 at 7.) In *McAllister*, the plaintiff worked as a machine operator prior to sustaining serious head and back injuries in a car accident. 983 F.3d at 965. When her employer asked what job functions the plaintiff was unable to perform, her spinal surgeon responded that plaintiff could not perform "any & all"

functions. *Id.* at 966. After terminating her employment, plaintiff sued, alleging her employer failed to accommodate her under the ADA. *Id.* at 967. In finding for her employer, the Seventh Circuit stated that once "an employee is evaluated by a doctor," the employer is "entitled to rely on a physician's recommendation that the employee is not able to safely perform an essential function of his job." *Id.* at 968. And plaintiff's doctor opined that she was "totally disabled" and unable to perform "any & all job functions." *Id.* As such, the court of appeals concluded that the undisputed facts established that the plaintiff was unable to perform the essential functions of her position and thus was not a qualified individual under the ADA. *Id.* at 969; *see also Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013) (affirming summary judgment for employer when employee had permanent lifting restriction of no more than 20 pounds and such lifting was an essential function of the job).

Here, unlike in *McAllister*, Dr. Scalzitti's restrictions are not so clear. Of the tasks Chic was asked to perform, floor stripping is the only *specific* task Dr. Scalzitti prohibited him from doing. The other restrictions—to avoid slippery or uneven surfaces—do not describe a *specific* task Chic is prohibited from performing, such as mopping. After Chic fell while floor stripping, the parties agree that Chic did not perform floor stripping again between July 2021 and July 2023. They disagree, however, as to why. Chic testified that after his falls, he received a Worker's Compensation Return to Work Report dated July 15, 2021, from Dr. Dresden stating that Chic should avoid stripping floors due to a pre-existing issue to avoid further injury. (McNulty Decl. ¶ 10, Ex. 8 to Chic Dep., Docket # 28-17.) Chic asserts that he provided a copy of this report to Wensing when he returned to work and assumed that Dr. Dresden's restriction was behind him not stripping floors. (Chic Dep.

at 74–77.) The District, in contrast, denies seeing this form until July 2023, when Milas asked Chic to strip the floors. (Wensing Dep. at 38–39.) Chic testified that he understood floor stripping to be the only task he could not perform (Chic Dep. at 112) because the task made the floor particularly hazardous, describing it as making the floor like "grease on top of ice on top of . . . grease . . . it's just so super slippery" (*id.* at 81). On this record, a reasonable jury could credit Chic's testimony and find that the District knew about this restriction in July 2021 and Chic performed the custodian job for two years without performing this function.

As to the restriction regarding avoiding slippery or uneven surfaces, the District interpreted this as a prohibition against the possibility of encountering water or chemicals. Wensing testified that 40 to 50 percent of a custodian's job consists of the possibility of encountering slippery floors. (Crane Decl. ¶ 4, Ex. B, Deposition of Joshua Wensing ("Wensing Dep.") at 44, Docket # 34-5.) He testified that even spraying chemicals creates a mist that drops to the floor and "in cases it makes the floor slippery"; thus, there was the "potential for wet or slippery floors" while performing such tasks as cleaning mirrors, cleaning water fountains, and disinfecting touch points. (*Id.* at 19, 21.) Francois similarly testified that he believed Chic would be unable to come into proximity to students entering the building after a rainfall or snowfall, as the halls would be wet and slippery. (Crane Decl. ¶ 2, Ex. A, Deposition of Lucas Francois ("Francois Dep.") at 27, Docket # 34-1.)

A reasonable jury could conclude that the District's interpretation of Dr. Scalzitti's restrictions was overbroad and unreasonable. Afterall, simply because a surface is wet does not necessarily mean it will also be slippery—the slipperiness will depend on the material of the floor and the individual's footwear. And Chic was indeed performing all other custodial

tasks, except for floor stripping, for two years with no incident. Chic testified that floor stripping made the floor uniquely slippery. Further, Chic testified that he was hired by the Franklin Public Schools as a full-time second shift custodian in November 2023. (Chic Dep. at 122.) Chic avers that he has worked successfully as a custodian for the Franklin School District from December 2023 through the present, performing all assigned tasks and duties with the exception of stripping floors, a task from which his supervisor has exempted him. (Chic Decl. ¶¶ 63–65.) The fact Chic is currently performing a similar job without incident supports the fact that Chic was capable of performing the essential functions of the custodian job. *See Stern*, 788 F.3d at 293 (stating that a plaintiff's ability to adequately perform the essential function of a comparable job after termination is relevant to his claim that he is capable of performing the essential function of the job).

Furthermore, the District never gave Chic the opportunity to clarify his understanding of the extent of his medical restrictions. Wensing testified that he did not discuss with Chic what job duties he believed that he could perform because the District "already had an understanding of what he could perform . . . based off the restrictions that his doctor produced." (Wensing Dep. at 53.) He testified that Dr. Scalzitti was "pretty specific on her fitness for duty form so there would not be a reason to question a professional on what they put down." (*Id.*) Francois testified that he directed Wensing to consult with other Districts that had similar custodial positions and ask if they would have meaningful work for someone with Chic's restrictions, and they reported that they would not. (Francois Dep. at 28.) He testified that the decision to terminate Chic's employment was made a day or two before the parties' final meeting on August 2. (*Id.*) Here, the complete lack of communication between the District and Chic from July 24, 2023, until the

termination meeting on August 2, 2023, could support a reasonable jury verdict in favor of Chic. Because a genuine dispute exists as to whether Chic is a "qualified individual" for purposes of the ADA, both parties' motions for summary judgment are denied.

#### 1.3 Whether the District Reasonably Accommodated Chic's Disability

The District further argues that Chic is responsible for any breakdown in the interactive process. (Docket # 24 at 26–31.) As stated above, the ADA requires the employer and the employee to engage in an "interactive process" to find a reasonable accommodation for the employee's disability. *Lawler*, 837 F.3d at 786.

The District argues that it engaged in a good faith interactive process by reviewing Chic's Fitness for Duty form and contacting other custodial supervisors at local school districts to learn if they could accommodate a full-time employee with Chic's restrictions. (Docket # 24 at 27.) The District argues that it was Chic who asked whether he could get his Fitness for Duty form amended and failed to do so. (*Id.* at 28–29.) Thus, the District argues that to the extent the interactive process broke down, it was because of Chic's inaction. (*Id.* at 29.)

The District's assertion, however, is belied by the undisputed facts. From the time Chic provided the Fitness for Duty form until the August 2 meeting in which he was terminated, neither Wensing nor Francois had any discussions with Chic about what job duties he believed he could perform. (Wensing Dep. at 53; Francois Dep. at 28.) While both testified that they were relying on Dr. Scalzitti's form (*id.*), this is not a substitute for the interactive process. "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne*

*Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). In this case, there was no communication between the parties.

Nor is the interactive process satisfied through a discussion between the employer and a third party that does not include the employee at issue. While Wensing and Francois may have consulted with other school districts, Chic was not privy to these conversations. A discussion that does not include the employee until the termination meeting is "not the 'interactive process' envisioned—and mandated—by the ADA." *Stern*, 788 F.3d at 292. Further, while the District faults Chic for his own alleged inaction, he was not given an opportunity to address the restrictions until the August 2 meeting in which he was terminated. (Chic Decl. ¶ 55.) Francois testified that the decision to terminate Chic's employment was made a day or two before the parties' final meeting on August 2 when the decision was communicated to Chic. (Francois Dep. at 28.) It is unclear what further action the District claims Chic should have done when the decision to fire him had already been made. A jury could conclude that the District failed to engage in the interactive process. While failure of the interactive process is not an independent basis for liability under the ADA, as explained above, Chic has presented sufficient evidence to reach a jury on the question of whether he was able to perform the essential functions of the job with an accommodation. *See Basden*, 714 F.3d at 1039.

1.4 Undue Hardship

The District further argues that it could not have accommodated Chic's disability without undo hardship to the District. (Docket # 40 at 22–25.) "'Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties.'" *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 594

(7th Cir. 2018) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). However, an accommodation is unreasonable if it imposes significant financial or administrative costs, or it fundamentally alters the nature of the program or service. *Id.*

The District argues that Chic asks it to disregard his physician's stated restrictions as an accommodation. (Docket # 40 at 22–23.) It argues that it cannot do so and following the restrictions would significantly alter the District's system of having each custodian clean an assigned section of the District's building. (*Id.* at 24.) The District asserts that given Chic's restrictions, there would be insufficient work for him to do and it would require other custodians to "help Chic perform the lion's share of his custodial duties." (*Id.*) But the District's position stems from the assumption that Dr. Scalzitti's restrictions are clear and unambiguous. As explained above, that is not the case. If, however, a jury determines that Chic's only restriction was an exemption from floor stripping, Chic has presented evidence that he was capable of performing all of his other custodial tasks with the exception of floor stripping; that he did, in fact, perform the job without issue for two years without floor stripping; and that he is currently performing a similar job and has done so since December 2023 with an exemption from floor stripping. For these reasons, a reasonable jury could find that Chic's requested accommodation is reasonable and does not create an undue hardship on the District.

*2. Discriminatory Termination*

Chic further alleges that the District terminated his employment because of his disability.

### 2.1 Legal Standard

Section 12112(a) of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) the adverse action was caused by his disability. *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022).

### 2.2 Application to This Case

For summary judgment purposes, the District does not challenge the first and third elements of Chic's claim. (Docket # 24 at 31–32.) Rather, the District contends that Chic was not qualified to perform the essential functions of his position and cannot show that his disability caused the discharge. (*Id.* at 32.) As to the second element of Chic's claim, for the reasons explained above, I find that disputes of material fact exist sufficient to create a jury question as to whether Chic was qualified to perform the essential functions of the custodian job with or without a reasonable accommodation.

Turning, then, to the causation element, to survive summary judgment, a plaintiff must show a genuine issue of material fact regarding whether his disability was the "but for" reason for the adverse action. *Wal-Mart Stores, Inc.*, 798 F. Supp. 3d at 897. "To show that disability discrimination was the 'but for' reason for the termination, a plaintiff can use either direct or circumstantial evidence." *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 504 (7th Cir. 2017). Direct evidence is rare; for example, an employer's admission that

a plaintiff was fired based on his disability. *See id.*; *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801–02 (7th Cir. 2018).

More commonly, a plaintiff will present circumstantial evidence of discrimination, such as suspicious timing; ambiguous statements or behavior towards other employees in the protected group; evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically received better treatment; and evidence that the employer offered a pretextual reason for an adverse employment action. *Id.* at 802. A plaintiff can also proceed under the "indirect" method of proving disability discrimination by employing the burden–shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Monroe*, 871 F.3d at 504.

In the last ten years, however, the Seventh Circuit has "tried to move away from the many multifactored tests in employment discrimination cases and decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge . . . .'" *Id.* (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). In other words, the question is not whether any particular piece or type of evidence proves the case by itself; rather, the evidence is assessed cumulatively to determine whether it permits a reasonable factfinder to find that Chic's termination was attributable to his disability. *See Adzogble v. Tyson Fresh Meats, Inc.*, 689 F. Supp. 3d 648, 654 (C.D. Ill. 2023).

The District argues that Chic has put forth no evidence that the District harbored discriminatory animus towards Chic because of his disability; rather, it argues that the "record in this case is clear" that Chic was terminated "because of the restrictions' effect on his ability to perform essential job functions." (Docket # 24 at 32.) The District argues that

Chic has adduced no evidence of ambiguous statements or behavior towards disabled employees, suspicious timing, or the District's more favorable treatment of similarly situated, non-disabled employees. (*Id.*) The District further argues that Chic has failed to show that the District's termination decision was pretextual. (Docket # 48 at 14–15.) On the other hand, Chic argues that Francois specifically stated the reason for Chic's termination was the District's inability to accommodate his disability and the District's lack of any good faith effort to try to accommodate him provides "ample evidence of discriminatory animus." (Docket # 43 at 28.)

Considering the evidence as a whole, Chic has sufficiently demonstrated a genuine issue of material fact as to whether the District terminated him because of his disability. Once again, Chic puts forth evidence that he worked for the District as a custodian for approximately ten years while having foot drop without incident. After suffering from two falls in July 2021 while floor stripping, Chic's doctor recommended Chic discontinue floor stripping. While the parties dispute whether the District was aware of this restriction until July 2023, the parties do not dispute that Chic continued to successfully work the job for two years without floor stripping. After asking Chic to have his doctor complete a Fitness for Duty form in July 2023, his doctor does so, again restricting him for stripping floors and specifically referring back to the July 2021 occupational health notes regarding the floor stripping restriction. The District, however, took Dr. Scalzitti's restriction to "avoid slippery or uneven surfaces" and to use "caution" with ladders, snow, and ice and interpreted it to mean that Chic was completely unable to "work with water" or climb a ladder. (Chic Decl. ¶ 54.)

The District does not dispute that it did not follow-up with Chic regarding Dr. Scalzitti's restrictions, despite the fact that the District does not dispute that Chic was successfully performing the custodian job for a decade with foot drop. Further, after he fell while floor stripping, Chic was able to perform the job without issue for another two years despite not stripping floors. Francois acknowledges that the District decided to terminate Chic's employment before it ever met with him. In other words, there was never a discussion about whether any reasonable accommodation (such as continuing to exempt him from floor stripping) could be made. Given Chic's evidence that he currently performs a substantially similar job with such an exemption, as well as the evidence that he worked successfully for the District for two years without being asked to strip the floors, coupled with the District's decision to terminate his employment with no interactive process and Chic's subsequent firing approximately one week after the District received Chic's Fitness for Duty form, a reasonable jury could find that Chic's disability was the "but for" cause of his termination. For these reasons, the parties' motions for summary judgment as to Chic's disparate treatment claim are denied.

*3. The District's Request for Partial Summary Judgment as to Damages*

The District alternatively moves for partial summary judgment as to several of Chic's alleged damages. (Docket # 24 at 33.) In his complaint, Chic asks for compensatory damages for lost wages, benefits, expenses, insurance, emotional pain and distress, mental anguish, and medical expenses; reinstatement or compensation in lieu of reinstatement; liquidated damages; costs, disbursements, interest and attorney's fees; and any other just and equitable relief. (Docket # 1 at 7.) The District argues that Chic is not entitled to

damages related to an early retirement benefit, differential vacation pay, and reinstatement. (Docket # 33 at 33–36.)

As to vacation benefits, the District argues that its employee handbook states that vacation days not used by the end of the applicable twelve-month period are forfeited. (Def.'s Reply to Pl.'s Resp. to DPFOF ¶ 130, Docket # 49.) It further argues that under Wisconsin law, "vacation" is not an independent financial benefit and is duplicative of his claim for backpay. (Docket # 24 at 34.) Chic does not address the District's argument in his brief in opposition. Rather, in response to the District's proposed factual finding, Chic asserts that he is entitled to damages for the unused vacation days because he "was deprived, by virtue of his termination, of the opportunity to use the additional vacation time"; thus, "his damages should include the amount he would have received if there was an option to cash out his unused vacation." (Pl.'s Resp. to DPFOF ¶ 130, Docket # 44-1.) Chic does not address the District's argument that this vacation pay request is duplicative of his request for backpay. As Chic has failed to respond to this argument in his brief in opposition, I find Chic has abandoned this request for damages. *See Watt v. Cnty.,* 210 F. Supp. 3d 1078, 1083 (E.D. Wis. 2016) .

As to retirement benefits, Chic claims "$60,000.00" for the District's early retirement benefit option offered to individuals between ages 50 and 55, subject to the caveat that "further discovery is necessary," to determine whether the District's benefit remained open and, if so, whether Chic was eligible for such benefit. (DPFOF ¶ 131 and Pl.'s Resp. ¶ 131.) The District argues that to be eligible for the early retirement benefit, Chic would have had to exercise his option by May 15, 2023, and failed to do so. (Docket # 24 at 35.) Chic does

not dispute the District's argument regarding his ineligibility for this benefit. Thus, the District's request for partial summary judgment as to this damages request is granted.

Finally, the District argues that although Chic has requested reinstatement as well as compensation in lieu of reinstatement, Chic has testified that he does not want to return to work for the District and thus, his request for reinstatement should be denied. (*Id.* at 35–36.) Once again, Chic has not responded to the District's argument. Furthermore, generally speaking, the ADA's purposes are not served by putting someone into a job they affirmatively do not want. *See McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1370–71 (7th Cir. 1992). Again, Chic also seeks compensation in lieu of reinstatement. Given Chic's testimony and his failure to respond to the District's argument, it appears Chic has abandoned reinstatement as a damages claim. For these reasons, the District's motion as to this claim of damages is granted.

## CONCLUSION

Chic alleges that the District failed to accommodate his disability and ultimately terminated his employment because of his disability. Because I find genuine disputes of material fact exist as to both of Chic's claims under the ADA, the parties' cross-motions for summary judgment are denied. However, as Chic has failed to respond to the District's motion for partial summary judgment as to his damages claims for vacation benefits, retirement benefits, and reinstatement, those damages claims are dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the Defendant's Motion for Summary Judgment (Docket # 23) is **DENIED**. However, Defendant's Motion for Partial Summary Judgment as to certain of Plaintiff's damages claims is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Summary Judgment (Docket # 29) is **DENIED**.

**FINALLY, IT IS ORDERED** that the clerk's office will contact the parties regarding further scheduling in this matter.

Dated at Milwaukee, Wisconsin this 11th day of September, 2026.

BY THE COURT

Nancy Joseph

NANCY JOSEPH
United States Magistrate Judge